Argued May 6, affirmed in part; reversed in part
September 18, 1968

LEATHERS, *Respondent, v.* CITY OF
BURNS, *Appellant.*

444 P. 2d 1010

*Ronald L. Marceau*, Bend, and *Wendell Gronso*, Burns, argued the cause for appellant. On the briefs were McKay, Panner, Johnson & Marceau, Bend.

*James H. Clarke*, Portland, argued the cause for respondent. With him on the brief were McColloch, Dezendorf & Spears and Wayne Hilliard, Portland, and McAllister, Burns, Gustafson & Lock, Gresham.

Before PERRY, Chief Justice, and O'CONNELL, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

LUSK, J.

This case involves the constitutionality of two ordinances of the City of Burns, Oregon, regulating the storage and delivery of gasoline. The plaintiff, who operates a gasoline service station in the city, sought, by his complaint, a declaration that the ordinances vio-

late the due process and equal protection clauses of the Federal and state constitutions and prayed for an injunction against their enforcement. The circuit court, after an extensive hearing, held that enforcement of these provisions deprived the plaintiff of property without due process of law and entered a decree accordingly from which the defendant City of Burns prosecutes this appeal.

Ordinance No. 350, so far as pertinent, provides:

"WHEREAS, the unloading of large quantities of petroleum fuels at other than bulk distribution plants is considered by the Common Council of the City of Burns to be extremely dangerous because of probable conflagration, * * *

"* * *, now therefore,

"BE IT ORDAINED BY THE CITY OF BURNS:

"*Section 1.* No vehicle having a conbined [sic] maximum capacity of over 2200 gallons shall be allowed to unload petroleum fuel with a flash point of less than one hundred degrees Fahrenheit within the corporate limits of the City of Burns except at bulk distributing plants now in existence or hereafter authorized by the Common Council of the City of Burns.

"*Section 2.* The term 'vehicle' or 'Unit of Vehicles' shall include a truck and trailer, or any other vehicle of whatever construction or any truck, vehicle, unit of truck and trailers or any other combination of vehicles."

Following a preamble similar to that above quoted from Ordinance No. 350, Ordinance No. 349, as amended, so far as pertinent, provides:

"No underground tank shall be kept or maintained for the storage of flammable liquids if such tank has a capacity in excess of 3,000 gallons, and no more than 4,000 gallons total capacity for all

tanks shall be maintained by any one garage, service station, residence or other business. * * *"

The challenged ordinances were purportedly enacted in the municipality's exercise of the police power as safety measures to prevent or minimize the danger of disastrous fires. Plaintiff alleges in his complaint that the ordinances are not reasonably related to this purpose, but, on the contrary, that they "create conditions which are injurious to the public safety and welfare."

As to the ordinance limiting the capacity of vehicles unloading gasoline, the complaint alleges that if smaller vehicles are used nearly four deliveries are needed to deliver the same quantities of gasoline as can be delivered by one large vehicle, that exposure to traffic hazards will be for much longer periods of time and there will be added danger because of the increased frequency of changing hose connections and opening and closing valves. The ordinance is further alleged to be discriminatory because it does not apply to deliveries of gasoline to bulk plants.

There are similar allegations with respect to ordinance No. 349, as amended, which limits the capacity of gasoline tanks in service stations. The complaint further alleges that the ordinances cause heavy financial losses to the plaintiff.

Plaintiff is a resident of Gresham in the Portland area. Burns is an Eastern Oregon city with a population of 4,100. There are six bulk plants for the storage of gasoline in Burns, but plaintiff does not get his gasoline supply from any of them. Instead, he gets it from the Texaco bulk plant in Portland and transports it to Burns by tank truck and trailer. The truck has a ca-

pacity of 4,000 gallons. Plaintiff owns two trailers, one with a capacity of 5,000 gallons and the other with a capacity of 4,300 gallons. His station is located about four blocks from the west city limits of Burns. There are four underground tanks on the premises, ranging in size from 4,000 to 10,000 gallons, and having a total capacity of 24,000 gallons. Ordinance No. 350 prohibits plaintiff from unloading the transport at his station, so he proceeds past it to the Burns airport, about four miles east of the city, where he transfers gasoline from the truck to a Dodge tanker, having a capacity of 1,800 gallons, which conveys its load back to the station. This process is repeated until the truck is empty. The trailer is left behind, fully loaded, to serve the purposes of a bulk plant. The other trailer, which had been serving the same purpose in the meanwhile and is now empty, is attached to the truck for the return trip to Portland.

During the winter months plaintiff sells an average of 20,000 gallons a month and he estimated that his sales would average 27,000 to 30,000 gallons per month during the summer. It is obvious that his cost of doing business is increased as the result of the larger number of transfer procedures and additional miles of transportation made necessary by the ordinances.[1] Plaintiff testified that this increased cost was approximately one cent a gallon.

To support his claim of unconstitutionality, plaintiff called witnesses whose qualifications to testify as

---

[1] Defendant points out in its brief that the increased expense would be less if plaintiff had selected a location to the west of the city for transferring his load to the Dodge delivery wagon. This is true, but, as there would be substantial additional expense anyway, plaintiff would still have standing to raise the constitutional question.

experts on the subject of the causes, prevention and control of gasoline fires are not to be questioned. They are John A. Ainlay of Chicago, Executive Secretary of the Central Region Committee of the American Petroleum Institute; James M. Hammack, Battalion Chief of the Los Angeles Fire Department assigned as Fire Prevention Engineer to the Fire Prevention Bureau and having specific responsibility with respect to industrial and commercial inspections, including gasoline service stations, in the City of Los Angeles; Oliver W. Johnson of Palo Alto, California, Consulting Fire Protection Engineer; and George F. Prussing of Washington D. C., consulting Fire Protection Engineer. They were allowed by the court to express their opinions that the ordinances do not promote safety, but, on the contrary, create an additional hazard. Their evidence is buttressed by model codes regulating tank trucks and underground tanks developed by the National Fire Protection Association, an organization with about 20,000 members representing the fire chiefs' associations, the insurance groups and industry interested in fire safety. These codes form the basis of legislation in 40 states and hundreds of cities and have been adopted by the Interstate Commerce Commission. They have never included any limitation on the size of delivery trucks or underground tanks.

The evidence shows that gasoline does not burn, but its vapors do. Gasoline is highly volatile and when vapors escape and are mixed with the air in the right proportions and a source of ignition is present, a spark for example, there will be a fire. If the proportion of vapor to air is less than one and one-half per cent it will not burn because it is too lean; if it is above seven per cent it will not burn because it is too rich. The major cause of fire from tank vehicles is crashes on

the highway.[2] A less frequent cause is human fault or negligence in transfer (loading or unloading) procedures. Plaintiff's expert witnesses testified that the Burns ordinances increase rather than diminish the danger of fire by multiplying the number of miles which plaintiff's vehicles, loaded with gasoline, must travel and the number of times gasoline must be transferred, with the possibility it may be exposed to the air. As Mr. Ainlay testified: "When you unload a truck you are involving the human element and the record will show that most of our accidents, most of our fires, involve human element." Moreover, the length of time consumed in transferring a given quantity of gasoline from a large tanker at a service station is less than that required to transfer it from a small tanker because the large tanker unloads through a three-inch hose, while the small one uses a one-inch hose.

As to the ordinance limiting the capacity of underground storage tanks, the parties are agreed that the safest place to store gasoline is in underground tanks. Defendant's brief frankly so concedes. There cannot be a fire in an underground tank which is in use, because the ratio of the vapor in the tank to air is far above seven per cent and it will not burn. A fire at the fill pipe cannot spread into the tank because gasoline vapor is heavier than air and the vapor is far too rich

---

[2] An exhibit introduced by the defendant shows that during the past several years fifty per cent of tank vehicle fires were the result of crashes on the highway. About twelve per cent were caused by faulty transfer procedures. Almost half of the traffic accidents were collisions with other vehicles; a fourth, collisions with railroad locomotives or stationary objects; and the remainder were caused by loss of control of the vehicle. As between small and larger tankers there is evidence that a survey disclosed that on a mileage basis tankers having a capacity of more than 3,000 gallons had far fewer accidents than smaller equipment, while on a gallon-delivered basis the accident ratio is from 8 - 1 to 10 - 1 in favor of the large tankers.

to burn. When the tank is being filled the vapor is forced out through a vent pipe which should be at least 12 feet high (plaintiff's station is so equipped) so that there will be no ignitible mixture at ground level. Vapors may be released at the fill pipe during the process of unloading or at a customer's automobile if the gasoline should overflow. These hazards are neither greater nor less because of the size of the tank or of the truck.

It is the defendant's theory that, whatever value the testimony of plaintiff's expert witnesses might have in other contexts, it has little application to this case. As the reply brief puts it, analysis of the issue whether the ordinances are a reasonable exercise of the city's police power "requires that the evidence be reviewed to determine whether there is a sufficient relationship between local conditions in Burns and the regulations contained in the ordinances to support the regulations." We proceed to an examination of these local conditions and the other evidence.

Burns does not have a fire department adequate to cope with a major conflagration. The city has a volunteer fire department with 28 volunteers. There are two pumper trucks equipped with fog nozzles, which are commonly used in containing gasoline fires, but no foam equipment, which is employed to save aircraft, a ship, or the like. Under an arrangement with the nearby city of Hines, the latter's volunteer fire department would respond to a call from Burns with one pumper truck. The next nearest fire department is at John Day, 69 miles distant.

There are 11 gasoline service stations in Burns, seven of them on Broadway, a north and south street, 56 feet wide from curb to curb, and the main thoroughfare through the business district. Broadway is also

highway U.S. 20. Vehicles transporting gasoline travel on Broadway, whether on their way through the city or bound for the bulk plants, which are located to the south of the business district, five of them in the industrial area. Going to and returning from the bulk plants, the vehicles make right and left turns and cross traffic.

Broadway, going south, is a downhill street for about seven or eight blocks through the business district. A number of buildings on the street have boarded-over coal chutes. There are no underground storm sewers except catch basins and culverts at the intersections. A witness for the plaintiff testified that spilled gasoline which enters a storm drain is not likely to result in a fire because there is nothing to ignite it and the mixture with the air would be too rich to burn.

Gasoline spilled at a service station on Broadway in the business district and running down the Broadway hill would not go underground except at the intersections. John G. Mingle, Jr., Assistant Professor of Mechanical Engineering at Oregon State University, testified to the probable results of a spillage of 5,000 gallons of gasoline at or near the top of the Broadway hill. He was of the opinion that if this occurred in hot weather there would be a destructive and widespread fire in a matter of minutes due to evaporation of the gasoline as it flowed swiftly down the gutter. He also pointed out the danger that the vapor, being heavier than air, could find its way into basements through the boarded-over coal chutes where there would likely be sources of ignition. His testimony supports the claim that the Burns Fire Department could not effectively fight such a fire. But he further testified that the department could not contain a fire if the quantity of gasoline involved were 2,000 gallons. Oregon State Fire

Marshal C. Walter Stickney, a witness for the defendant, testified that the department probably could handle a fire from a 1,000 gallon spillage, depending on the circumstances. Avel Diaz, Assistant Fire Chief of Burns, another witness for the defendant, expressed the same opinion, but thought that a 5,000 gallon spillage would present a serious problem.

Due to the slope of the ground at the plaintiff's service station, gasoline spilled there would flow in the direction of a built-up residence district. Four of the five bulk plants in the industrial area are located on level ground between a ditch and roadbeds of railroad tracks, forming a sort of dike, and a spillage of gasoline there would be largely contained. Spillage from the other bulk plant in the industrial area would threaten only some old cabins. The bulk plant not in the industrial area is next to a motel and, admittedly, is a "dangerous situation." The bulk plant tanks are partly underground and partly above ground. There is a potential danger in filling a storage tank above ground not encountered at an underground tank, for gasoline goes into the latter by gravity, while the former is filled under pressure.

Plaintiff's station faces Hines Boulevard, a continuation of Highway 20. It is on the south side of the street. The paved portion of the street there is 24 feet wide, 4,500 cars per day pass the station and the designated speed at that point is 40 miles per hour. Traffic in the vicinity of the bulk plants, on the other hand, is very light.

A tank truck and trailer combination is usually more than 60 feet in length. The plaintiff's measures 60½ feet. According to the testimony of Lloyd Larsen, Chief of Police of Burns, the city has only two service stations (one of them being the plaintiff's) that "are

equipped to handle this type of truck." They could not get into the others. Plaintiff's station is a modern one, located on a triangular plot of ground. It borders on three streets and there is easy access to it from Hines Boulevard for a large tanker.

In Burns the majority of traffic accidents are caused by stopping, starting and turning.

The National Fire Protection Association recommends a regulation requiring that tank trucks which distribute gasoline to service stations and whose total capacity is in excess of 3,000 gallons be divided into compartments, no one of which shall exceed 2,500 gallons. The regulation does not apply to trucks which make deliveries to bulk plants. According to Mr. Prussing, the regulation has both an economic and a safety aspect; the operators of the trucks favored it because it facilitated unloading; the fire services favored it because they felt it reduced the hazard in case of an overturning or collision within a city by reducing the quantity of gasoline spilled.

Another regulation of NFPA requires a tanker to be equipped with what is called a "tight-fill" connection. This is a safety device which, coupled to the hose, makes overflow impossible when unloading a cargo of gasoline. Plaintiff's large truck tank and trailers are not compartmented and none of his vehicles is equipped with a tight-fill connection.

The following witnesses for the defendant expressed the opinion, taking into account local conditions, that the ordinances do in fact promote the public safety of the City of Burns: Howard Eddy, Manager of the Traffic Safety and Education Division of the Oregon Department of Motor Vehicles, Stan Phillips, Deputy to the Oregon State Fire Marshal, Chief of Police

Larsen, Professor Mingle, Jr., and Oregon State Fire Marshal Stickney.

As to the ordinance regulating deliveries, the basis of their opinions is that there is added danger of traffic accidents to large tankers, and consequent spillage of large quantities of gasoline and large fires, if these tankers are permitted to go in and out of service stations to deliver gasoline.

A large transport cannot execute a turning movement in order to enter a service station without invading the lane of opposing traffic, and it takes longer to turn than a small tanker with its shorter wheel base. Mr. Eddy expressed the opinion that, as between a 2,200 gallon truck making four or five deliveries to a service station in Burns, and a truck and trailer sixty feet or more in length making one delivery, under the same circumstances, the latter would constitute a greater traffic hazard.

Fire Marshal Stickney testified that the basic danger in underground storage is leakage, which is difficult to detect. In answer to the question whether a large tank constitutes a greater hazard than a smaller one, he answered: "I don't think it does where it's properly regulated, but then without comprehensive regulations, to some degree it probably would." He indicated that these regulations should include "inventory controls."

Leakage may be caused by corrosion which develops into a pencil hole. Large tanks are less subject to corrosion than the small ones because they are built of heavier metal. The leakage would be discovered before a full discharge from the tank by "ordinary inventory methods"—that is, the loss of gasoline would be discovered when the supply is metered. Moreover, as Mr. Ainlay testified, it is not the size of the tank,

but the level of the gasoline above the hole, which determines the amount of the leakage.

We will consider first the plaintiff's contention that Ordinance No. 350, regulating the delivery of gasoline to service stations, violates the Due Process and Equal Protection Clauses of the United States Constitution. What we hold applies equally to plaintiff's claim of violation of comparable provisions of the Constitution of Oregon.

Plaintiff concedes that his business is subject to regulation by the municipality, but asserts that the ordinance is arbitrary and discriminatory.

 The ordinance was enacted in the exercise of the city's police power, ostensibly to protect the public safety. In considering the claim of a violation of Due Process it is no part of the court's function to inquire whether the legislation is wise or unwise: *Joseph E. Seagram & Sons v. Hostetter*, 384 US 35, 47, 86 S Ct 1254, 16 L ed 2d 336; *Ferguson v. Skrupa*, 372 US 726, 728-730, 83 S Ct 1028, 10 L ed 2d 93, 95 ALR2d 1347; *Williamson v. Lee Optical Co.*, 348 US 483, 488, 75 S Ct 461, 99 L ed 563; *Berman v. Parker*, 348 US 26, 32, 75 S Ct 98, 99 L ed 27. And see *Oregon City v. Hartke*, 240 Or 35, 47, 400 P2d 255. Before a court can strike down a regulation enacted in the exercise of the police power it must be able to say, and that beyond a reasonable doubt, that it "has no rational relation" to its objective: *Williamson v. Lee Optical Co.*, supra, 384 US at 491. "[W]here legislative action is within the scope of the police power, fairly debatable questions as to its reasonableness, wisdom and propriety are not for the determination of courts, but for that of the legislative body on which rests the duty and responsibility of decision." *Standard Oil Co. v. Marysville*, 279 US 582, 584, 49 S Ct 430, 73 L ed 856.

The opinions of the eminent experts who testified that Ordinance No. 350 increases, rather than reduces, the danger of gasoline fires, are assuredly entitled to respectful consideration. The facts upon which they base their opinions are not in dispute and their conclusions are reasonable, but the question is whether the City Council of Burns could reasonably have reached a different conclusion.

The Common Council of the City of Burns could have been legitimately concerned with the danger of large and disastrous fires caused by spillages of large quantities of gasoline and could reasonably have determined that this danger would be to some extent controlled or averted by the ordinance. Putting to one side the opinion evidence of the city's expert witnesses, the NFPA compartmenting regulation and Mr. Prussing's testimony with reference to it are enough to justify the reasonable belief that the spillage of a large quantity of gasoline is a danger to be specially guarded against and that one way to guard against it is to limit the capacity of the tankers unloading gasoline at retail service stations. Of course, it could be argued that the NFPA regulation accomplishes its purpose without increasing the number of tanker trips required to deliver a given quantity of gasoline. To avoid this argument the city says that it lacks the employees to enforce a compartmenting ordinance. Plaintiff disputes this. We do not decide the question, for we think that, granted the danger, it is not for this court to say that the city should have taken a better way to deal with it. And, although it is not to be doubted that the more frequently motor vehicles are on the road and the further they travel the greater is the risk of accident, the Council could reasonably have determined that, due to their size and lesser maneuverability, large tankers going in

and out of service stations are more vulnerable to accident than small delivery tank wagons, and that an accident to the former presents a more serious threat to the safety of the city and its inhabitants.

Candor compels the statement that the ordinance, insofar as it necessitates a greater number of deliveries of gasoline, can hardly be justified as a safety measure, for there can be no reasonable doubt about the proposition that the more frequently gasoline is handled, the greater is the risk of fire. The city argues, however, that there might be an accident to a truck unloading in a service station with possibility of a larger fire if a large truck is involved. Upon that subject Mr. Ainlay testified:

> "* * * I have been checking on accidents for years and years and I, in all my experience, have never heard of a gasoline truck ever being struck or tipped over or anything while unloading at a service station. To my knowledge, I don't believe that it has ever happened."

He further testified that a large truck will withstand a greater impact than a small one because it is built of heavier material. Fire Marshal Stickney testified that there is a "potential" of an accident to a truck unloading in a service station, that he had no statistics about it, but could develop them, and referred to one instance where a concrete truck ran into a city delivery truck while it was in a station unloading gasoline.

We think it was within the province of the Burns Common Council to weigh the evidence of the competing risks—the additional exposures to accidents, whether to vehicles or in the transfer of gasoline, on the one hand, and the danger of large and disastrous fires on the other, and to make a choice. That the choice

may not have been the wiser one is beside the point so far as the constitutional question is concerned.

It is true, as the plaintiff asserts, that the ordinance does not bar from the streets of Burns large tank trucks carrying gasoline, and that occasionally such trucks pull into a service station for some purpose other than unloading or turn off into a side street. There is no evidence that these are common practices and the Council might well have regarded instances of this sort as of comparatively minor consequence. As the Supreme Court of the United States said in *Williamson v. Lee Optical Co.*, 348 US 483, 489:

> "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. Texas, 310 U. S. 141. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. Dental Examiners, 294 U. S. 608. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A. F. of L. v. American Sash Co., 335 U. S. 538."

Passage of the trucks through the city could not, of course, be prohibited. The trucks that serve the bulk plants are on a different footing. We have already seen in the discussion of the NFPA compartmenting regulation that the storage of gasoline at bulk plants is treated differently than at retail service stations. Mr. Ainlay testified that in the application of safety rules "there's a logical classification between a bulk plant on one hand and a service station on the other hand." Bulk plants are usually, as is the case here, differently located than retail service stations, are not on busy streets, and are not patronized by the general public.

Here the case merges into the plaintiff's claim

of denial of equal protection. Classification based upon some reasonable ground is permitted; "it is only 'invidious discrimination' which offends the Constitution," *Ferguson v. Skrupa*, supra, 372 US at 732. The Burns Council could properly except the bulk plants from the delivery ordinance. It is apparent that the only practicable way of supplying bulk plants, other than by railway cars, is by the use of large tank trucks, and while, to a degree, they may be a source of the same dangers as those vehicles would be if permitted to supply retail service stations, the danger is less. At least the Burns Council could have so found from the evidence before us. It must be remembered that, as Mr. Justice Holmes said: "The Fourteenth Amendment is not a pedagogical requirement of the impracticable." *Dominion Hotel v. Arizona*, 249 US 265, 268, 39 S Ct 273, 63 L ed 597. And see *Savage v. Martin*, 161 Or 660, 694, 91 P2d 273. We may add that the court may not, in considering the claim of violation of equal protection, attribute any improper motive to the Common Council of Burns in adopting these ordinances. 16 Am Jur 2d 383, Constitutional Law § 168.

■ We hold that Ordinance No. 350 is a valid exercise of the police power and does not offend either the Due Process or the Equal Protection Clause of the Fourteenth Amendment.

The question of the constitutional validity of Ordinance No. 349, the storage ordinance, has received scant attention in the briefs and appears to be a subordinate one. In view of our holding that the delivery ordinance is valid, it would seem to be of small moment to the plaintiff whether he can have a 3,000 gallon tank or a 10,000 gallon tank at his service station. The question is here, however, and must be decided.

The defendant, in addition to generalizations re-

specting the courts' deference to the legislative judgment—to which we agree—relies on the expert testimony of State Fire Marshal Stickney, and his Deputy Marshal Stan Phillips, that this ordinance promotes the public safety of the City of Burns, and on the reasons they give in support of their opinions.

These reasons may be summarized as follows: A leakage caused by corrosion may go on for a long time if it is not detected through inventory control and if the operator is careless, and there have been numerous instances of such leakages. The danger to be apprehended is that the gasoline will find its way through the ground into basements or under structures and there be ignited. Inventory control should therefore be enforced by regulation. Burns has no such regulation. The danger is greater in the case of a large tank than a small one because in the latter "the quantity that might leak and the distance that it might go would be of lesser degree than if it was a larger tank."

We observe first that inventory control, if needed at all, is needed for all tanks regardless of size. There is no evidence or argument to the contrary.

The contention that there is greater danger of fire when gasoline leaks from a large tank than from a small one, because the former will travel farther, will not bear analysis. We are concerned with tanks *in use*, in which the gasoline supply is replenished from time to time as needed. In any tank of whatever size the gasoline will continue to leak as long as it remains above the level of the hole. In any tank of whatever size the amount of the leakage over a given period of time will depend on the size of the hole, not on the size of the tank. And in any tank of whatever size the leak will continue and, presumably, the gasoline will travel an increasingly greater distance, until the leak is de-

tected. The problem of detecting leaks is precisely the same for all service station operators, and it will hardly be said that the size of gasoline tanks has any relevance to the fact that some operators are less vigilant than others. The only reasonable deduction from the evidence is that it is not the size of the tank, but the duration of the leak which determines the extent of the danger.

▊▊ The weight to be given to experts' judgments depends upon "the reasonableness of their conclusions and the force of their reasoning." *Market Street R. Co. v. Comm'n*, 324 US 548, 560, 65 S Ct 770, 89 L ed 1171. Upon the question now being considered the opinions of the defendant's experts are not entitled to weight because they are not supported by valid reasoning. On the other hand, the defendant concedes frankly, as we have said, that an underground tank is the safest place to store gasoline, and it is the uncontradicted evidence that there is less danger of corrosion in a large tank because it is built of heavier metal than in a small one. The whole of the evidence compels the conclusion that there is no greater danger of fire from gasoline stored in a tank of 10,000 gallons capacity than in a tank of 3,000 gallons capacity, and that there is no connection between the public safety and this underground storage ordinance. We, therefore, hold that the ordinance is an unwarranted regulation of a legitimate business and a violation of plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.[9]

---

[9] It is of interest to note that 40 years ago Standard Oil Company attacked as unconstitutional a municipal ordinance requiring all tanks used for the storage of gasoline and other inflammable liquids to be underground. Standard Oil Company v. Marysville, supra, 279 US 582. Standard argued, among other things, the difficulty of discovering a leak in an underground tank. The court held the ordinance constitutional.

In sustaining the constitutionality of the delivery ordinance we find ourselves in disagreement with other courts for which we have high regard. See *Clark Oil & Refining Corp. v. Tomah*, 30 Wisc 2d 547, 141 NW2d 299; *City of Colorado Springs v. Grueskin*, Colo, 422 P2d 384; *Humble Oil and Refining Co. v. City of Georgetown*, Tex Civ App. 428 SW2d 405; *Standard Oil Company v. City of Gadsden*, 263 FS 502 (ND Ala); *Ex parte Rodgers*, Tex Cr App, 371 SW2d 570; *McCoy v. Town of York et al*, 193 SC 390, 8 SE2d 905. We regret our inability to follow these decisions. We believe that the reason for our disagreement with them is that we have felt bound, under the more recent decisions of the United States Supreme Court interpreting and applying the Due Process and Equal Protection Clauses of the Fourteenth Amendment, to accord a wider latitude to the discretion of state legislative bodies in determining the propriety of measures deemed necessary to promote the safety, health and welfare of the community, than might have been considered permissible 30 or 40 years ago.

The decree of the circuit court holding Ordinance No. 350 unconstitutional is reversed; the decree holding Ordinance No. 349 unconstitutional is affirmed.

No costs or disbursements will be allowed.

GOODWIN, J., dissenting in part and concurring in part.

While I concur fully in the majority opinion with respect to Ordinance No. 350, I would also reverse as to Ordinance No. 349. The majority opinion reveals that the question of the constitutionality of No. 349 is a close one. I would resolve that doubt in favor of the city, not because the city's reasons for the ordinance are necessarily the more convincing, but because the

question is essentially a matter of legislative judgment and one on which reasonable men can differ.

To my mind, the most convincing reason for staying our hand with reference to Ordinance No. 349 is that the ordinance was intended to be an integral part of a legislative package. With No. 349 on the books, No. 350 may be more easily enforced. Indeed, if one could read the minds of the drafters of such legislation, it is entirely possible that their principal reason for enacting No. 349 was to make No. 350 more or less self-enforcing and thus to eliminate a potential enforcement problem. This would clearly be a legitimate legislative purpose.

For the foregoing reasons I dissent from the part of the decision which holds Ordinance No. 349 to be unconstitutional.

O'CONNELL, J., joins in this dissenting and concurring opinion.