377 So.2d 668 (1979)
UNITED YACHT BROKERS, INC., Appellant,
v.
Betty J. GILLESPIE et al., Appellees.
No. 53304.
Supreme Court of Florida.
November 21, 1979.
*669 Michael D. Stewart of Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellant.
Gary B. Sack and Donald E. Van Koughnet, Miami, for Gillespie, Mortimer and Klien; and Brian R. Hersh and Jeffrey A. Bernstein of the Law Offices of Brian R. Hersh, Miami, for Anstett and Siewert, appellees.
Richard E. Gentry, Staff Atty., Tallahassee, for Dept. of Business Regulation, amicus curiae.
OVERTON, Justice.
This is a direct appeal transferred to us by the Fourth District Court of Appeal, United Yacht Brokers, Inc. v. Gillespie, 353 So.2d 574 (Fla. 4th DCA 1977), because the trial court inherently passed on the validity of section 537.05, Florida Statutes. We have jurisdiction.[1] The statute requires licensed yacht brokers to obtain written authorization from their principal before engaging in any transaction.
The relevant facts are as follows. Keith Johnson, now deceased, approached United Yacht Brokers, Inc. (United), seeking help in finding a yacht suitable for purchase. United is a Florida corporation licensed to *670 operate under the Florida Yacht and Ship Brokers Act. Johnson allegedly orally agreed to pay United a commission for its efforts.
Arthur Brown, a broker with United, worked closely with Johnson showing him several vessels. One yacht which Brown showed Johnson was the "Sea Prince," owned by appellees Arthur Siewert and Edgar Anstett. Negotiations, conducted for Johnson by Brown, culminated with Johnson's signing a purchase agreement to buy the "Sea Prince" for $400,000 in cash and the trade of a house valued at $260,000. The purchase agreement was conditioned on Siewert's inspection and approval of the house.
Following rejection of the house by Siewert and a subsequent offer by Johnson, Siewert allegedly told Brown that he wished to meet with Johnson alone. The pair met on the "Sea Prince" where Siewert purportedly induced Johnson to deal directly with him and not through Brown. After this meeting, Johnson dealt solely with Siewert and refused to enter a later purchase agreement proposed by United. Johnson purchased the yacht from Siewert and refused to pay United a commission on the sale.
United filed a two-count lawsuit. In count one it alleged that Johnson, who died and was replaced in the suit by his personal representatives, breached the brokerage agreement. The complaint did not allege compliance with section 537.05(2), Florida Statutes, which requires licensed yacht brokers to procure written authorization from a principal before acting on behalf of the principal.[2] In count two United alleged that Anstett and Siewert tortiously interfered with a contractual relationship. Following two dismissals of the complaint, United filed a second amended complaint which alleged in both counts that section 537.05(2) was unconstitutional. This time the trial court dismissed count one with prejudice, removing Johnson's estate from the lawsuit. Thereafter, the trial court granted Anstett and Siewert a summary judgment upon the tortious interference grounds set forth in the second count. Both the dismissal with prejudice and the summary judgment were on the grounds that United failed to comply with section 537.05(2).
United appealed both orders to the Fourth District which transferred the appeal to us, finding that the trial court inherently passed on the constitutionality of section 537.05(2). Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee Airport Authority, 111 So.2d 439 (Fla. 1959).

I. Constitutional Issues

United contends that the legislature, by requiring yacht brokers to obtain prior written authorization before acting on behalf of a principal, a requirement imposed on no other class of licensed brokers of regulated commodities in this state, has impermissibly singled out yacht brokers for disparate treatment in violation of the equal protection clause.
The parties agree that no suspect classification is involved. They agree that all that is required to sustain the treatment which yacht brokers as a class receive under this legislation is a showing that the law is rationally and reasonably related to some legitimate legislative purpose and is not arbitrarily or capriciously imposed. This is the applicable test. Golden v. McCarty, 337 So.2d 388 (Fla. 1976); Lasky v. State Farm Insurance Co., 296 So.2d 9 (Fla. 1974); Wiggins v. City of Jacksonville, 311 So.2d 406 (Fla. 1st DCA 1975).
In applying this test to the challenged statute, we find that the legislature was within its authority. The act is reasonable because by requiring a writing to secure authorization for a licensed broker to act for one desirous of buying or selling a yacht, all parties to such a transaction receive *671 a measure of protection. In this state which has miles of waterways and coastline, one need not look far to find seagoing vessels of every shape and size. The yachts, which are defined in section 537.02 of the act, are the most expensive and largest of these vessels. They are also highly mobile. This statute ensures that a buyer seeking to purchase a yacht from a seller through a broker will indeed to dealing with an agent of the owner of a vessel which is in fact for sale. Likewise, a seller wishing to place a yacht on the market may designate the broker of his choice by choosing him in writing. Appellant has provided us with background information which reveals that it was the concern of yacht brokers themselves that led to the adoption of the act. Their concern with flourishing con artists, the morals, ethics and standards of their profession, and a desire to protect themselves as well as the buying and selling public prompted them to seek passage of this act. It is interesting that appellant, who has simply disregarded a provision of the act, now asserts that it unfairly discriminates against yacht brokers.
We reject the contention that this written authorization requirement must be struck down because a similar statutory provision does not apply to other licensed brokers of regulated commodities. In assessing a similar challenge to a law regulating the fitting of eyeglasses, the United States Supreme Court said:
The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.... Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind... . The legislature may select one phase of one field and apply a remedy there, neglecting the others... .
Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (citations omitted).
Indeed, Florida courts, too, have recognized that the legislature may move in increments to regulate businesses within the state. In Noble v. State, 68 Fla. 1, 4, 66 So. 153, 154 (1914), this Court reasoned:
The Legislature may regulate some occupations, and not regulate others, when private rights secured by the Constitution are not thereby invaded and the regulations that are provided operate with substantial fairness upon practically all persons similarly situated, so that the governmental authority be not arbitrarily exercised to injure the substantial rights of or to oppress any person... .
Accord, Mayo v. Polk, 124 Fla. 534, 169 So. 41, appeal dismissed, 299 U.S. 507, 57 S.Ct. 39, 81 L.Ed. 376 (1936).
Finally, to accept United's position would virtually require that all brokers of all commodities must be regulated identically. This is not required, and, accordingly, we find that section 537.05(2) is a reasonable legislative classification serving a valid purpose under the state's police power.
While equal protection concerns legislative classifications, due process of law protects against legislative deprivation of life, liberty, or property. The test applied, when no fundamental rights are at stake, is basically the same under either constitutional provision. To sustain a legislative action of this type against a due process attack, the statute must simply bear "a reasonable relation to a permissible legislative objective" and must not be "discriminatory, arbitrary or oppressive." Lasky v. State Farm Insurance Co., 296 So.2d 9, 15 (Fla. 1974) (footnote omitted). The determination in our equal protection analysis that the statute bears a reasonable relationship to a permissible purpose similarly satisfies the requirements of this due process test. We totally reject the contention that section 537.05(2) unconstitutionally restricts or abridges the opportunities of yacht brokers to pursue their livelihood.

II. Intentional Interference with Contractual Relationship

Our affirmance of the trial court on the two constitutional grounds resolves the *672 dispute in favor of Johnson's estate. Although we are not required to do so, we will proceed to dispose of the remaining issue, properly preserved on this appeal. See Allen v. State, 326 So.2d 419, 420 (text accompanying note 2) (Fla. 1975). The second count of United's complaint concerns the question of whether a tortious interference claim against Anstett and Siewert could exist despite the failure to comply with section 537.05(2).
Anstett and Siewert contend that because the contract between United and Johnson was void and thus unenforceable for failure to comply with section 537.05(2), no cause of action for tortious interference can exist against them. We hold that the unenforceable nature of the alleged contract between United and Johnson does not bar a suit for intentional interference with a contract or an existing business relationship against Anstett and Siewert.
Anstett and Siewert have cited Roberts Co. v. P.B.O. Ltd., 322 So.2d 633 (Fla. 3d DCA 1975), for the proposition that a contract, unenforceable for failure to comply with the statute of frauds, cannot support an action for tortious interference. That case is readily distinguishable from the instant case. In Roberts Co. the actions for breach of contract and for tortious interference were brought against the same party  the one who had allegedly defaulted on the contract. The Roberts Co. court recognized that a tort action can be validly brought against a third party who interferes with the transaction and that is the situation in the instant case.
It has long been established that an injured party may sue the party who defaults on a contract and may also maintain an independent cause of action against a wrongdoer who induced the breach. E.g., Harvey Corp. v. Universal Equipment Co., 158 Fla. 644, 29 So.2d 700 (1947). This separate cause of action recognizes that economic relations are entitled to freedom from unreasonable interference. It may seem improper that a cause of action in tort should be permitted to arise, as in the instant case, from an otherwise unenforceable agreement. In this regard, Dean Prosser was quoted in Allen v. Leybourne, 190 So.2d 825, 828 (Fla. 3d DCA 1966), a case in which a suit for tortious interference with a contract to make a bequest was permitted, despite the unenforceability of the contract. We find his reasoning most persuasive:
The agreement need not, however, be enforceable by the plaintiff as a contract... . The law of course does not object to the voluntary performance of agreements merely because it will not enforce them, and it indulges in the assumption that even unenforceable promises will be carried out if no third person interferes. Accordingly, it usually is held that contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, or harsh and unconscionable provisions, or conditions precedent to the existence of the obligation, can still afford a basis for a tort action when the defendant interferes with their performance.
W. Prosser, Handbook of the Law of Torts, § 129 at 932 (4th ed. 1971). In this case it is entirely reasonable to assume that absent the alleged interference, United would have been paid its commission regardless of the enforceability of its agreement with Johnson.
Although we do not condone United's failure to comply with section 537.05(2), neither will we permit Anstett and Siewert to use it as a shield to limit their liability for tortious interference, a practice to which brokers of all types are peculiarly susceptible. See generally Sutton v. Stewart, 358 So.2d 119 (Fla. 1st DCA 1978); Keyes Co. v. Robert J. Fewell Co., 291 So.2d 31 (Fla. 3d DCA), cert. denied 302 So.2d 415 (Fla. 1974); Mead Corp. v. Mason, 191 So.2d 592 (Fla. 3d DCA 1966), cert. denied 200 So.2d 813 (Fla. 1967).
We hold, therefore, that the trial court must be reversed from granting a summary judgment in favor of Anstett and Siewert. Accordingly, we affirm the constitutional validity of section 537.05(2), Florida Statutes (1977), and reverse the entry of a summary *673 judgment upon the tortious interference claim. This cause is remanded for further proceedings consistent with this opinion.
It is so ordered.
ENGLAND, C.J., and ADKINS and SUNDBERG, JJ., concur.
BOYD, J., dissents with an opinion.
BOYD, Justice, dissenting.
I concur with that portion of the majority opinion which holds the regulatory statute in question to be supported by a rational basis and therefore constitutional. I respectfully dissent from that portion which holds that this yacht broker can recover the equivalent of his commission from sellers who never employed him.
Section 537.05(2), Florida Statutes (1975), provides:
Before any licensee under this chapter shall engage in any transaction for which a license is required under this chapter, he shall obtain a written authorization from his principal so to act. A telegraphic authorization from the principal shall be deemed to comply with the requirements of this section.
The failure of United Yacht Brokers to secure a written authorization, as required by the statute, rendered its claim to a commission from the buyer unenforceable. Dugas v. Dubois, 221 So.2d 771 (Fla. 4th DCA 1969).
In Dugas v. Dubois it was held that a broker could not recover based on an oral contract given him by the yacht owner, even though the yacht was sold by the broker's efforts. It was held further that the broker's claim could not be enforced by way of theories of ratification, estoppel, or quantum meruit. This was so even though the oral listing was given before the effective date of this regulatory provision. The court said:
General statutes of fraud are provided for the protection of the parties and the courts have found them not applicable in many cases because of the circumstances of the case or the actions of the parties. This statute, however, is both regulatory and penal. The statute provides that every violation of its provisions is a misdemeanor. In such cases, strict compliance is required in order not to nullify its intended purpose.
Id. at 772. The court also quoted the following passage from American Jurisprudence:
If a broker's contract does not satisfy a statute providing that a contract for compensation for procuring a purchaser for real property must be in writing, or a like statute, it has generally been held that the broker cannot recover in quantum meruit, quasi contract, implied contract, or the like. To hold otherwise, it is said, would nullify the effect of the statute completely, and it has generally been reasoned that rules permitting recovery in quantum meruit in cases involving completed oral contracts coming within general statutes of frauds have no application to permit a like recovery in the case of an oral contract coming within a statute requiring a contract to pay a broker's commission to be in writing.
12 Am.Jur.2d, Brokers, § 53 (footnotes omitted).
In that portion of the majority opinion which upholds the constitutionality of the statute, there is a discussion of the reasonable legislative considerations supporting the regulatory requirement. The legislative purpose cannot be achieved if the sanction imposed to achieve it can be evaded. In an effort to compel compliance with the requirement of the statute, the legislation prohibits registered yacht brokers from receiving commissions without securing written listings. Recognition of a right to damages from a third party based on tortious interference frustrates this legislative purpose.
A broker has no right to receive a commission on a sale from a party who did not employ him or agree to pay it. Borinsky v. Cohen, 86 So.2d 814 (Fla. 1956); Moss v. Sperry, 140 Fla. 301, 191 So. 531 (1939). Recognition of the right of recovery for *674 tortious interference enables the broker who cannot enforce his claim for commission against the party that employed him to collect its equivalent from the other party.
I would affirm the summary judgment.
NOTES
[1] Art. V. § 3(b)(1), Fla. Const.
[2] Section 537.05(2) provides:

Before any licensee under this chapter shall engage in any transaction for which a license is required under this chapter, he shall obtain a written authorization from his principal to so act. A telegraphic authorization from the principal shall be deemed to comply with the requirements of this section.