# Third District Court of Appeal

**State of Florida**

Opinion filed March 9, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-2603
Lower Tribunal No. 11-33223
_____

**Silvio Membreno and Florida Association of Vendors, Inc.,**
Appellants,

vs.

**The City of Hialeah, Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Jorge E. Cueto, Judge.

Institute for Justice, and Justin Pearson and Robert Peccola, for appellants.

Lorena Bravo, City Attorney; Akerman LLP, and Michael Fertig and Jennifer Cohen Glasser, for appellee.

Before ROTHENBERG, SALTER, and LOGUE, JJ.

LOGUE, J.

Silvio Membreno and the Florida Association of Vendors, Inc. (collectively, "the Street Vendors") appeal the decision of the trial court upholding the constitutionality of the City of Hialeah's 2013 amendments to its ordinance governing street vendors. We affirm on all points raised. In light of Estate of McCall v. United States, 134 So. 3d 894 (Fla. 2014), we write to clarify the scope of the rational basis test used to review whether laws violate the substantive due process provision of Florida's Declaration of Rights.

**FACTS**

The Street Vendors challenge two provisions of the City of Hialeah's Code of Ordinances. The first challenged provision states, in pertinent part, that "[n]o peddler or itinerant vendor[1] soliciting or conducting sales on foot can permanently stop or remain at any one location on public property; or private property (unless allowed for by zoning)." Hialeah, Fla., Code § 18-302 (2013). The second challenged provision states, in pertinent part, that vendors "soliciting or conducting sales on foot may display, with the intent of soliciting sales, only as much of the goods, merchandise or wares as the . . . vendor can carry on [his or her] person." Hialeah, Fla., Code § 18-304 (2013).

---

[1] The Code defines "peddlers and itinerant vendors" as including "all persons going from place to place for the purpose of selling or offering for sale, any goods, merchandise or wares for immediate delivery of the goods, merchandise, or wares at the time the order is taken, whether or not using a wagon, pushcart or other vehicle." Hialeah, Fla., Code § 18-301 (2013).

In whereas clauses, the City Commission made the following legislative fact findings:

> [S]treet vending contemplates a transaction between the street vendor afoot and the driver or occupant of a motor vehicle while the vehicle is on the traveled portion of the roadway and is not legally parked.
>
> . . . .
>
> [T]he street vendors presently store and display their merchandise openly in the public rights-of-way and on private property without regard to the intended use of the public rights-of-way, safety of the pedestrians using the public rights-of-way, or the general requirement in the City's zoning code in all commercial and industrial districts that all storage of products and materials be entirely within a building and the specific prohibition against the operation of open air markets, bazaars and flea markets in the City's retail commercial district;
>
> [S]treet vendors in the conduct of their lawful business activity should enjoy co-terminous rights on private property as would the owners themselves to display or store merchandise.

Hialeah, Fla., Ordinance 13-01 (Jan. 9, 2013).

Silvio Membreno is a street vendor who sells flowers. His business model is to set up his display of flowers in a private parking lot near the corner of an intersection in Hialeah. Although he sells flowers to people who walk or drive into the parking lot, he mainly carries flowers out into the street and sells them to cars waiting in the lanes of traffic at red lights. He testified that the Ordinance provision prohibiting him from vending in one location impacts his business because his usual customers will not know where to find him. He asserts that it also endangers him because it is safer for him to enter the lanes of traffic where he knows the

3

traffic patterns. In addition, the Ordinance provision that limits him to displaying only inventory that he can carry impacts his business because he loses sales when his customers cannot direct him to bring items from a larger display. As another vendor with a similar business model testified, a customer might see the flowers she was carrying, but ask her to go and get flowers of a different color from the larger display on the roadside.

The parties filed cross-motions for summary judgment. The trial court granted the City's motion and denied the Street Vendors' motion. The court entered a judgment stating, "[i]n accordance with the rational basis standard . . . the Court finds that there are legitimate interests supporting the challenged Ordinance provisions and that the challenged Ordinance provisions are rationally related to such legitimate government interests." This appeal followed.

## ANALYSIS

### A. The Street Vendors' Arguments: Florida Supreme Court Abandoned the Traditional Rational Basis Test.

The Street Vendors attack these Ordinance provisions on a narrow basis. If successful, however, their arguments would herald a sea change in Florida constitutional law. They argue the Ordinance fails the rational basis test under the due process clause of article I, section 9 of the Florida Constitution. In doing so, they contend that the Florida Supreme Court has abandoned the traditional rational basis test. While Florida's rational basis test might once have been identical to the

4

federal rational basis test, they argue that after McCall, Florida's rational basis test is different from the "watered-down, highly deferential version of the federal rational basis test."

"[T]he Florida rational basis test," they maintain, "is more stringent than the federal rational basis test." The federal test is "loosey goosey" because it permits "courts [to] speculate about whether a law could be rationally related to its stated purpose." In contrast, the Florida test puts the burden squarely on the government. And that burden is to prove "there is a reasonable relationship between the restrictions and their purported purpose based on record evidence of their actual effects (or lack thereof) in advancing that purpose—not speculation about those effects."

In short, the Street Vendors claim McCall portended a revolution in Florida substantive due process. Unless the government succeeds in establishing an evidentiary predicate for a law, the Street Vendors maintain, judges are free to set aside legislative judgments regarding whether a law is needed and, if so, how best to address that need. Without expressly saying so, the Street Vendors read McCall as essentially reviving the discredited, substantive due process jurisprudence of Lochner v. New York, 198 U.S. 45 (1905), and its progeny.

**B. Overview of Opinion.**

While some language in the plurality opinions in <u>McCall</u> can be read to support the Street Vendors' arguments, we conclude that the Florida Supreme Court has not abandoned Florida's traditional rational basis test.

Essentially the same as the federal rational basis test, the Florida rational basis test has played a central role in the separation of powers under the Florida Constitution for decades. The federal rational basis test, from which the Florida test is derived, was adopted to defuse a great constitutional crisis created by the same subjective substantive due process standard the Street Vendors claim the Florida Supreme Court is adopting. To avoid that sort of subjectivity, however, the Florida Supreme Court adopted a substantial body of law governing the rational basis test. This body of law focuses on five essential principles: (1) "reasonable" means "fairly debatable"; (2) the party challenging the constitutionality of a law bears the burden of proof; (3) legislative findings are not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data; (4) legislation can be based on nothing more than experiment; and (5) the Constitution does not prohibit the legislature from enacting unwise or unfair laws. The <u>McCall</u> decision, which is comprised of two distinct plurality opinions, does not contain the type of express and direct overruling of precedents that would mark the end of such a large, important, and long-standing body of black letter law.

6

**C. The Florida Rational Basis Test is the Same as the Federal Test**.

    1. <u>Statement of the Florida Rational Basis Test.</u>

When a law regulating business or economic matters, which does not create a suspect class or infringe upon a fundamental right, is challenged as violating the substantive due process protected by Florida's Declaration of Rights, the law must be upheld if it bears a rational basis to a legitimate government purpose.

This authoritative statement of the rational basis test has been recognized by the Florida Supreme Court repeatedly. For example, in considering whether a statute "violates the due process clauses of the United States and Florida Constitutions," the Court stated: "the proper standard by which we must evaluate the Legislature's exercise of the police power in the area of economic regulation is whether the means utilized bear a rational or reasonable relationship to a legitimate state objective." <u>Belk-James, Inc. v. Nuzum</u>, 358 So. 2d 174, 175 (Fla. 1978).

Similarly, in an opinion authored for the majority by Justice Lewis, the Florida Supreme Court expressly quoted and approved a decision in which a statute had been challenged as violating "the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States and Article I, section 9 of the Florida Constitution" and upheld the statute because it "bears a rational relationship to [its] legislative objectives." <u>McKnight v. State</u>, 769 So. 2d 1039, 1039 n.1 (Fla. 2000) (citation omitted).

Moreover, the rational basis test under Florida due process is the same as the rational basis test under Florida equal protection,[2] and in the context of equal protection, "there are two prongs to the rational basis test, requiring the Court to consider both whether the statute serves a legitimate governmental purpose and whether the Legislature was reasonable in its belief that the challenged classification would promote that purpose." McCall, 134 So. 3d at 918-19 (Pariente, J., concurring in result).

2. Essential Similarity Between Florida and Federal Rational Basis Tests.

As these authorities indicate, the Street Vendors' statement that "the Florida rational basis test is more stringent than the federal rational basis test" is incorrect. No one disputes that the Florida rational basis test is "based on precedent from the United States Supreme Court." McCall, 134 So. 3d at 921 (Pariente, J., concurring in result). The due process provisions of the Florida and federal constitutions from which the rational basis tests derive use virtually identical language,[3] the two tests

_____

[2] State v. Robinson, 873 So. 2d 1205, 1214 (Fla. 2004) ("The rational relationship test used to analyze a substantive due process claim is synonymous with the reasonableness analysis of an equal protection claim."); United Yacht Brokers, Inc. v. Gillespie, 377 So. 2d 668, 671 (Fla. 1979) ("The determination in our equal protection analysis that the statute bears a reasonable relationship to a permissible purpose similarly satisfies the requirements of this due process test."); State v. Walker, 444 So. 2d 1137, 1138 (Fla. 2d DCA 1984) (noting that the test for equal protection and substantive due process claim "is essentially the same where no fundamental rights are at stake"); see also Warren v. State Farm Mut. Auto. Ins. Co., 899 So. 2d 1090, 1096 (Fla. 2005) (holding, in a case involving Florida's equal protection and due process provisions, that "[t]he analysis involved in the due process determination closely resembles that of the equal protection analysis").

8

are stated the same way,[4] and, in <u>Belk-James</u> and <u>McKnight</u>, the Florida Supreme Court used the same test and the same analysis to resolve challenges brought under both federal and Florida substantive due process. The two different constitutional provisions establish one, identical rational basis test.

This has been the law of Florida for over 50 years. In 2004, for example, the Florida Supreme Court analyzed a challenge to a statute based on the rational basis test of the due process provisions of article I, section 9 of the Florida Constitution and the Fourteenth Amendment of the United States Constitution. <u>Haire v. Fla. Dep't of Agric. & Consumer Servs.</u>, 870 So. 2d 774, 781 (Fla. 2004). After quoting both provisions in full, <u>id.</u> at 781 n.6, Justice Pariente, writing for the majority, treated these distinct constitutional due process provisions as presenting a single,

identical rational basis test:

---

[3] Article I, section 9 of the Florida Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." The Due Process Clause of the Fourteenth Amendment to the United States Constitution similarly provides that no State shall "deprive any person of life, liberty or property without due process of law."

[4] The modern federal rational basis test under federal substantive due process is that a law is valid if it bears a rational relation to a legitimate government purpose. <u>See, e.g.</u>, <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 23 (1989); <u>Restigouche, Inc. v. Town of Jupiter</u>, 59 F.3d 1208, 1214 (11th Cir. 1995). This language is virtually identical to the language of Florida's rational basis test under Florida substantive due process as stated by the Florida Supreme Court in <u>Belk-James</u> and <u>McKnight</u>.

Under this standard of review, referred to as either the reasonable relationship or the rational basis test, a state statute must be upheld . . . if there is <u>any</u> reasonable relationship between the act and the furtherance of a valid governmental objective. (emphasis supplied). . . . [T]he burden is on the one attacking the legislative enactment to negate every conceivable basis which might support it.

<u>Haire</u>, 870 So. 2d at 782 (citations and quotations omitted). A line of cases so holding extends back at least to 1974.[5]

To interpret identical language in a virtually identical context in an identical manner is only common sense. It encourages the maintenance of an active and informed citizenry by causing the law to be less obscure, less arbitrary, and more comprehensible to the Florida community at large. This result is not changed because the Florida rational basis test, like the federal test, once had additional language.[6]

---

[5] <u>See</u> <u>Shands Teaching Hosp. & Clinics, Inc. v. Mercury Ins. Co. of Fla.</u>, 97 So. 3d 204, 212 (Fla. 2012) (holding that the "substantive due process rights under the Florida and United States Constitutions" are analyzed under one, single, identical rational basis test); <u>Ilkanic v. City of Fort Lauderdale</u>, 705 So. 2d 1371, 1372 (Fla. 1998) (reviewing a challenge under the "due process provisions of the United States and Florida constitutions" under the identical rational basis test); <u>Lite v. State</u>, 617 So. 2d 1058, 1059 (Fla. 1993) (holding that the rational basis test under "both substantive due process and equal protection under the Florida and U.S. Constitutions," requires "a state statute must bear a reasonable relationship to a permissible legislative objective") (citations omitted); <u>Lasky v. State Farm Ins. Co.</u>, 296 So. 2d 9, 17 (Fla. 1974) (holding that a law "comports with the requirements of due process of law" under the federal and Florida constitutions because "the act before us is reasonably related to a permissible legislative objective").

[6] The Street Vendors seize on the fact that Florida's rational basis test was once stated in a formula that included, not only the language of the modern Florida

3. The Cornerstone of Modern Separation of Powers.

In deciding whether McCall changed this law, we cannot overlook the importance of the rational basis test. It is a critical component of the modern

---

rational basis test, but also the additional language "and is not discriminatory, arbitrary, or oppressive." See, e.g., Lasky, 296 So. 2d at 15, 17 (including this additional language at one point but leaving it out at another). So did early versions of the federal test. See, e.g., West Coast Hotel Co. v. Parrish, 300 U.S. 379, 398 (1937) (stating the requirements of due process are satisfied if the challenged laws "have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory"). The most recent statements of the Florida and federal tests dropped this additional language. See, e.g., City of Dallas, 490 U.S. at 23; McCall, 134 So. 2d at 918 (Pariente, J., concurring in result); Belk-James, 358 So. 2d at 175; McKnight, 769 So. 2d at 1040 n.1.

These additional words were dropped for the simple reason that they added no meaning. A law bearing a rational basis to a legitimate legislative purpose is, by definition, not discriminatory, arbitrary, or oppressive, as those words are used in the test. Conversely, a law that is discriminatory, arbitrary, or oppressive cannot, by definition, bear a rational basis to a legitimate legislative purpose.

Indeed, the Street Vendors failed to point us to, and our own research has failed to disclose, any Florida case that treats the additional language as reflecting any meaning other than that the law must bear a rational basis to a legitimate government purpose. See Lasky, 296 So. 2d at 17 (holding, after stating the test as including the additional language, that the test was satisfied because "the act before us is reasonably related to a permissible legislative objective").

The words are best understood as a rhetorical flourish conveying not content, but only emphasis, even as lawyers sometimes use the redundant expressions "cease and desist" to mean "stop," "last will and testament" to mean "will," and "unreasonable and arbitrary" to mean "unreasonable."

11

framework for the proper separation of powers between the judicial branch and the political branches.

This framework for separation of powers recognizes that the judicial branch's power and responsibility to determine whether a law violates substantive due process and equal protection are at their maximum regarding laws that establish suspect classes (e.g., race or ethnicity) or infringe on fundamental rights (e.g., speech or religion). In these areas, courts also have at least a modicum of guidance from existing constitutional rules and constitutional policies whether a legislative choice should be replaced by a judicial choice. For these sorts of laws, courts undertake a demanding examination of the need for the law or action and whether the law or action actually serves that need. This examination is called "strict scrutiny." In such cases, "[t]he legislation is presumptively unconstitutional. . . . [T]he State must prove that the legislation furthers a compelling State interest through the least intrusive means." N. Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So. 2d 612, 625 n.16 (Fla. 2003). In this review, courts scrutinize legislative findings and judgments. Id.

Under this same modern understanding of the proper separation of powers, however, courts' power and responsibility to determine whether a law violates substantive due process and equal protection are at their absolute minimum concerning laws, such as business and economic regulations, that do not establish

12

suspect classes and do not infringe fundamental rights. In these areas, courts have little or no guidance from pre-existing constitutional rules and constitutional policies as to whether to replace a legislative choice with a judicial choice. For such laws, courts undertake only a limited review that is highly deferential to the legislature's choice of ends and means. This review is the rational basis test. As discussed in more detail below, this test places the burden of proof on the challenger to the law. And the burden is very heavy indeed. See, e.g., Haire, 870 So. 2d at 782. This framework for the separation of powers was the product of over a half-century of conflict between the judicial and political branches of government.

**D. Origins of the Rational Basis Test in the Constitutional Crisis of the Lochner Era.**

1. The Crisis of Lochner Subjective Due Process.

"In order to know what [the law] is," Justice Oliver Wendell Holmes famously wrote, "we must know what it has been, and what it tends to become." Oliver Wendell Holmes, The Common Law 1 (1881). The federal rational basis test was the result of the constitutional crisis that erupted during the Lochner era. A review of the history that produced the rational basis test suggests that the Florida Supreme Court would not abandon it lightly.

The Lochner era, which ran from approximately 1870 to 1937, witnessed the emergence of economic and social problems resulting from ongoing urbanization,

13

industrialization, and the organization of business at a national level through trusts and monopolies. Confronted with problems legislators had never previously faced, Congress and state legislatures began regulating the free market in new and startling ways. Among other things, legislatures enacted unproven and largely experimental laws setting minimum wages and imposing maximum working hours.

Judges who had come of age during the previous era, when the common law policies reflected a commitment to rugged individualism and laissez-faire capitalism, were dismayed by these blatant efforts to manipulate free markets. Faced with unprecedented, and in their view, one-sided enactments, both federal and state courts began holding that these business regulations violated substantive due process. From 1905 to 1937 alone, over 200 state laws regulating business in a pro-worker and pro-consumer manner were declared unconstitutional because they violated this broad concept of substantive due process. Erwin Chemerinsky, Substantive Due Process, 15 Touro L. Rev. 1501, 1503 (1999).

In Lochner, the case that gave its name to this discredited jurisprudence, the United States Supreme Court declared unconstitutional a law that set maximum working hours for employees of bakeries at sixty hours per week. 198 U.S. at 64. As the dissent observed, the law was based on the legislative finding that the bargaining positions of the employer and employee were not equal. Id. at 69 (Harlan, J., dissenting) (referring to the legislature's "belief that employers and

employees in such establishments were not upon an equal footing, and that the necessities of the latter often compelled them to submit to such exactions as unduly taxed their strength").

The justices in the majority believed, however, that the only consistently reliable way to resolve such employer and employee disputes was the free market. Based on their sincere and profound convictions in this regard, they reweighed, reevaluated, and rejected the legislature's basis for the law. The employees, the court reasoned, are "equal in intelligence and capacity to men in other trades or manual occupations" and were "in no sense wards of the state." Id. at 57. The maximum hour law violated substantive due process, the majority concluded, because it consisted of nothing more than "mere meddlesome interference," id. at 61, with "the freedom of master and employee to contract with each other in relation to their employment." Id. at 64.

This approach to judicial review continued in cases like Adkins v. Children's Hosp. of the D.C., 261 U.S. 525, 560 (1923), where the Court held that an act of Congress establishing a minimum wage in the District of Columbia for low-paid women violated the substantive due process clause. The Court refused to accept the legislature's conclusion that there was a rational connection between the legitimate purpose of helping women caught in poverty and a mandatory higher

wage, even though the conclusion was supported by a substantial legislative record:

> A mass of reports, opinions of special observers and students of the subject, and the like, has been brought before us in support of this statement, all of which we have found interesting, but only mildly persuasive. That the earnings of women are now greater than they were formerly, and that conditions affecting women have become better in other respects, may be conceded; but convincing indications of the logical relation of these desirable changes to the law in question are significantly lacking. They may be, and quite probably are, due to other causes.

Id. at 560 (emphasis added). As this language indicates, the Court assumed for itself the power to reweigh and reevaluate Congress's legislative judgment. The Court felt free to set aside any legislative findings which were only "mildly persuasive." The depth of the sincere feelings of the majority on this point is captured by the passionate rhetoric they used: a minimum wage law for poor women was "so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States." Id. at 559.

Unsurprisingly, this encroachment by the judiciary into the domain of the political branches drew a predictable political backlash. Theodore Roosevelt, Robert La Follette, and William Jennings Bryan were only a few of those who conducted national campaigns attacking the judiciary. The Democratic Party Platform of 1936 went so far as to call for a Constitutional amendment "clarifying" that "the legislatures of the several States and . . . Congress of the United States . . .

16

[have] the power to enact those laws . . . [as they] find necessary, in order adequately to regulate commerce, protect public health and safety and safeguard economic security." Democratic Party Platform of 1936 (June 25, 1936), reprinted in Henry Steele Commager, Documents of American History 538, 540 (5th ed. 1949).

The political assault on the judiciary climaxed in 1937 with President Franklin Delano Roosevelt's court packing plan. Roosevelt had just won by the fourth largest electoral margin in American history, taking every state but Vermont and Maine, and adding to his party's already lopsided majorities in the House and Senate. Setting aside his party's platform calling for a constitutional amendment limiting judicial review, he demanded Congress immediately adopt a statute providing for an additional member of the Supreme Court for every sitting justice over seventy years of age.

While the Senate judiciary committee was debating the measure, the Court issued the opinion of West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937), which Harvard Law Professor (later Justice) Felix Frankfurter described as a "somersault." In West Coast Hotel, the Supreme Court reversed itself and upheld a minimum wage law for women virtually identical to the one overturned in Atkins. It did so on the basis that laws do not violate substantive due process if they "have a reasonable relation to a proper legislative purpose," thereby establishing the

rational basis test. Id. at 398.[7] This adoption of the rational basis test, along with other measures taken by the Court, defused the crisis. It is this traditional rational basis test, whose adoption played such an important role in turning a political tide threatening to engulf the judiciary, that the Street Vendors claim the Florida Supreme Court has abandoned.

2.  The Nadir of Judicial Competence.

"[T]he very word 'Lochner' is for legal insiders synonymous with judicial overreach." Akhil Reed Amar, America's Unwritten Constitution 273 (2012). Chief Justice Rehnquist compared the damage Lochner inflicted on courts to the damage caused by the Dred Scott decision. William H. Rehnquist, The Supreme Court 115 (2d ed. 2004). "Lochner," Justice Scalia wrote, is "discredited." Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 690 (1999). Justice Souter labeled Lochner's subjective substantive due process the American judiciary's "nadir of competence." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 166 (1996) (Souter, J., dissenting). "No one wants to replay that

---

[7] This formulation traces back to Justice John Marshall Harlan's dissent in Lochner. Lochner, 198 U.S. at 68 (Harlan, J., dissenting) ("If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere."). As occurred in Plessy v. Ferguson, 163 U.S. 537 (1896) and the Civil Rights Cases, 109 U.S. 3 (1883), Justice Harlan's dissent shaped the course of American constitutional law more than the majority opinions.

discredited history," Justice Breyer has written. Stephen Breyer, <u>Active Liberty: Interpreting Our Democratic Constitution</u> 41 (2005).

The error of this jurisprudence, it is sometimes said, was to constitutionalize free market economics. This criticism slightly misses the mark. If any economic model deserves to be elevated to a constitutional plane, it would surely be the free market system, which holds a uniquely central position in American society.

Rather, the problem of <u>Lochner</u>'s subjective due process is that it elevated to a constitutional height <u>any</u> economic theory or, for that matter, <u>any</u> social theory, thereby allowing judges to use a non-constitutional policy to replace the choices made by the legislature. As Justice Holmes pointed out in his famous dissent, the "Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of laissez faire. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." <u>Lochner</u>, 198 U.S. at 75-76 (Holmes, J., dissenting).

A competent judge can certainly analyze an economic regulation and identify the way different parties and classes are benefited or injured. But absent fundamental rights or suspect classifications, which provide at least a degree of

constitutional direction, the choice of how to balance competing economic interests is a policy question that is largely political in nature because no pre-existing neutral principles exist to govern the judge's decision. At the end of any such analysis, the judge is left with little more guidance than the very same subjective political convictions a person would use if he or she were voting as a legislator during a roll call or a citizen at the polls. A decision of this sort may be well-intentioned, even admirable, but it is not judicial. In the final analysis, the defect in <u>Lochner</u>'s economic due process is that it bids a judge to replace legislative choices with judicial choices based on nothing more than what the judge believes is the public good.

**E. The Five Principles of Florida's Traditional Rational Basis Test.**

1. <u>"Reasonable" and "Rational" Means "Fairly Debatable."</u>

To limit the subjectivity that may lurk in any rational basis analysis, the Florida Supreme Court, over several decades, has adopted five principles. First, as Justice Pariente noted for the majority in <u>Haire</u>, under the rational basis test, "a state statute must be upheld . . . if there is <u>any</u> reasonable relationship between the act and the furtherance of a valid governmental objective." 870 So. 2d at 782 (citation and quotation omitted). It is the burden of the party challenging the law to prove that "there is <u>no conceivable</u> factual predicate which would rationally support the [law]." <u>Fla. High Sch. Activities Ass'n v. Thomas</u>, 434 So. 2d 306, 308

20

(Fla. 1983) (emphasis added). This is "a deferential standard." <u>McCall</u>, 134 So. 3d at 921 (Pariente, J., concurring in result). In fact, "rational basis scrutiny is the most relaxed and tolerant form of judicial scrutiny." <u>Kuvin v. City of Coral Gables</u>, 62 So. 3d 625, 632 (Fla. 3d DCA 2010) (citation and quotations omitted).

Under this relaxed and tolerant standard for rationality, a law will be upheld if it is "fairly debatable;" meaning that it is fairly debatable whether the purpose of the law is legitimate and it is fairly debatable whether the methods adopted in the law serve that legitimate purpose. <u>See, e.g.</u>, <u>Gallagher v. Motors Ins. Corp.</u>, 605 So. 2d 62, 70 (Fla. 1992) (holding that a tax statute withstood a challenge under the substantive due process provisions of the federal and state constitutions because "it is 'at least debatable' that a rational relationship exists between the premium tax and the objective of increased regulatory control"). "The fact that there may be differing views as to the reasonableness of the Legislature's action is simply not sufficient to void the legislation." <u>Warren v. State Farm Mut. Auto. Ins. Co.</u>, 899 So. 2d 1090, 1096 (Fla. 2005). "Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment." <u>West Coast Hotel</u>, 300 U.S. at 399. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." <u>Williamson v. Lee Optical of Okla.. Inc.</u>, 348 U.S. 483, 488 (1955).

This standard is not only designed to be lenient, it is intended to be objective. The rational basis test does not license a judge to insert courts into a disagreement over policy or politics. It merely requires a judge to decide if reasonable people might disagree. If we are intellectually honest, we will admit that most legislation easily passes this test.

This lenient and objective test applies because:

The legislature is vested with wide discretion to determine the public interest and the measures necessary for its achievement. The fact that the legislature may not have chosen the best possible means to eradicate the evils perceived is of no consequence to the courts provided that the means selected are not wholly unrelated to achievement of the legislative purpose. A more rigorous inquiry would amount to a determination of the wisdom of the legislation, and would usurp the legislative prerogative to establish policy.

Fraternal Order of Police, Metro. Dade Cty., Lodge No. 6 v. Dep't of State, 392 So. 2d 1296, 1302 (Fla. 1980) (internal citations omitted). "In applying this standard of review, a court must remain cognizant of the legislature's broad range of discretion in its choice of means and methods by which it will enhance the public good and welfare." Haire, 870 So. 2d at 782 (citation and quotation omitted).

2. The Party Challenging the Constitutionality of the Law Has the Burden of Proof.

Under the rational basis test, "[t]he burden is on the one attacking the legislative enactment." E. Air Lines, Inc. v. Dep't of Revenue, 455 So. 2d 311, 314

22

(Fla. 1984). <u>See also</u> <u>Lite v. State</u>, 617 So. 2d 1058, 1060 (Fla. 1993) ("Under the rational basis standard, the party challenging the statute bears the burden of showing that the statutory classification does not bear a rational relationship to a legitimate state purpose."); <u>Fla. High Sch. Activities Ass'n</u>, 434 So. 2d at 308 ("The burden is upon the party challenging the statute or regulation to show that there is <u>no</u> conceivable factual predicate which would rationally support the [law].").

3. <u>Legislative Findings and Judgments are Not Subject to Courtroom Fact Findings and May Be Based on Rational Speculation Unsupported by Evidence or Empirical Data.</u>

Justice Pariente, writing for the Court, stated the next principle as follows: "under a rational basis test, a legislative choice is not subject to courtroom fact-finding." <u>Haire</u>, 870 So. 2d at 787 (citation and quotation omitted). Legislative choices in economic regulations are not subject to courtroom fact finding because such laws "may be based on rational speculation unsupported by evidence or empirical data." <u>City of Fort Lauderdale v. Gonzalez</u>, 134 So. 3d 1119, 1121 (Fla. 4th DCA 2014). <u>See also</u> <u>Lucas v. Englewood Cmty. Hosp.</u>, 963 So. 2d 894, 896 (Fla. 1st DCA 2007); <u>Zurla v. City of Daytona Beach</u>, 876 So. 2d 34, 36 (Fla. 5th DCA 2004); <u>Hudson v. State</u>, 825 So. 2d 460, 468-69 (Fla. 1st DCA 2002).

Courts deal in findings of concrete facts concerning past events based on record evidence subject to strict standards of reliability, codified in the rules of

evidence and procedure. So it is understandable that a court might attempt to import concepts of record-based fact finding into their review of the legislative process. But this attempt constitutes error. While courts deal with record-based facts of past events, legislatures generally do not.

When enacting laws, legislatures are not normally looking at the type of concrete facts found in courtrooms by judges and juries. Consider a legislature debating whether to enact rent control. Does an emergency exist that justifies capping rents? The question of the existence of an emergency is not so much an empirical fact as a value judgment. Even the decision of what criteria to use to decide whether an emergency exists (e.g., rent for middleclass families, displacement in older neighborhoods, availability of affordable housing for the working poor, or the number of homeless) rests not on concrete facts, but on a community's attitudes and shared vision relating to that particular problem. A situation viewed as perfectly acceptable in one community may be viewed as a crisis in another. The legislative choices in such matters are not driven by the sort of finding of historical facts regarding past events which occurs in a courtroom. They are based instead on legislative findings that are more akin to value judgments than judicial fact finding. In our system of government, only democratically elected representative bodies are competent to form the sorts of legislative judgments upon which these legislative choices are based.

Earlier decisions suggest that legislative findings might be subject to an evidentiary challenge in court. See, e.g., Seagram-Distillers Corp. v. Ben Greene, Inc., 54 So. 2d 235, 236 (Fla. 1951) ("If the subject upon which the legislature makes findings of fact is one which is fairly debatable, the presumption of correctness attaches and remains extant until and unless such findings are challenged and disproved in an appropriate proceeding."). But such cases are in direct conflict on this point with later cases like Haire which expressly hold "under a rational basis test, a legislative choice is not subject to courtroom fact-finding." 870 So. 2d at 787 (citation and quotation omitted).

They are also in direct conflict with cases like Gallagher which concluded laws should be upheld under rational basis where "the legislature rationally could have believed that the challenged statutory scheme would promote the asserted legislative objective. Whether the statutory scheme in fact would promote the legislative objective is not dispositive." 605 So. 2d at 70 (emphasis added). "It is likewise clear that where there is a plausible reason for a legislative enactment, it is constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." Id. at 69 (citation and quotations omitted).

Cases like Seagram-Distillers are also at odds with the overwhelming tide of federal and state decisions on this point. See, e.g., Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993) ("[A] legislative choice is not

subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). In sum, they have lost their authority as precedent on this point because they directly and expressly conflict with a subsequent and larger body of Florida Supreme Court cases. See, e.g., Haire; Gallagher; Gonzalez; Lucas; Zurla; and Hudson, supra.

Indeed, a court conducts hearings to determine facts only if there is a good faith dispute of material fact. In a rational basis review, however, once a court determines there exists a good faith conflict over facts, some of which support the legislative finding, the court must uphold the finding because the law must be upheld if "it is at least debatable." Gallagher, 605 So. 2d at 70. See also Nat'l Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1127 (7th Cir. 1995) ("Even in litigation about torts and contracts, a court holds evidentiary hearings only when necessary to resolve material disputes of fact. [Under rational review], to say that such a dispute exists—indeed, to say that one may be imagined—is to require a decision for the state. Outside the realm of 'heightened scrutiny' there is therefore never a role for evidentiary proceedings.").

Thus, although courts should not act as rubber stamps when analyzing a law under the rational basis test, neither should the courts presume to second guess the legislature by purporting to conduct a courtroom-style evidentiary hearing

26

regarding a legislative finding that is really more of a value judgment than a historical fact.

    4. <u>Legislation Can Pass the Rational Basis Test Even if Purely Experimental.</u>

The rejection of courtroom fact finding as a basis to conduct a rational basis review of legislation is not grounded solely on the difference between judicial and legislative decision making. It is also grounded on the plain truth that "[m]ost laws dealing with economic and social problems are matters of trial and error." <u>Am. Fed'n of Labor, Ariz. State Fed'n of Labor v. Am. Sash & Door Co.</u>, 335 U.S. 538, 553 (1949) (Frankfurter, J., concurring). For this reason, "Legislative bodies have broad scope to experiment with economic problems." <u>Ferguson v. Skrupa</u>, 372 U.S. 726, 730 (1963). On this point, Justice Breyer observed that the essential "failing of <u>Lochner</u>" was that it "depriv[ed] the people of the democratically necessary room to make decisions, <u>including the leeway to make regulatory mistakes</u>." Stephen Breyer, <u>Active Liberty: Interpreting Our Democratic Constitution</u> 41 (2005) (emphasis added).

Many legislative experiments fail, but in failing, provide the experience needed to draft a more effective law. To give just one example, the current Federal

Deposit Insurance Laws were developed out of state experiments that initially failed. Am. Sash & Door Co., 335 U.S. at 553 n.10. Another experiment that bore good fruit was the decision by the Florida Supreme Court to allow courtroom proceedings to be televised.

The United States Supreme Court rejected a due process challenge to the Florida Supreme Court's decision to allow cameras in the courtroom specifically on the basis that states must be allowed to conduct such experiments: "Dangers lurk in this, as in most experiments, but unless we were to conclude that television coverage under all conditions is prohibited by the Constitution, the states must be free to experiment. We are not empowered by the Constitution to oversee or harness state . . . experimentation." Chandler v. Florida, 449 U.S. 560, 582 (1981). This was true even in the absence of empirical or scientific evidence that the experiment would be a success. Id. at 576.

In upholding the Florida Supreme Court's decision to allow courtroom proceedings to be televised, the United States Supreme Court summoned the spirit of Justice Lewis Brandeis, who advised: "Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932)

(Brandeis, J., dissenting). Because democracy needs the leeway to experiment, the "Court is not a tribunal for relief from the crudities and inequities of complicated experimental economic legislation." Sec'y of Agric. v. Cent. Roig Ref. Co., 338 U.S. 604, 618 (1950).

5. The Constitution Does Not Prohibit Legislatures from Passing Unwise Laws.

Under the rational basis test, courts recognize that the legislature has the discretion to enact economic laws based on legislative value judgments, reasonable hypotheses, and even experiments. For errors in the exercise of such powers, again provided no fundamental right or suspect classification is involved, the legislature is largely not answerable to, or subject to correction by, courts through judicial review. This is true even if the law strikes a judge as unwise or unfair.

"The wisdom, policy, or motives which prompt a legislative enactment, so far as they do not contravene some portion of the express or implied limitation upon legislative power found in the Constitution, are not subject to judicial control." Scott v. Williams, 107 So. 3d 379, 385 (Fla. 2013) (citation omitted). See, e.g., Belk-James, 358 So. 2d at 177 ("[A]rguments . . . which essentially question whether the best means of regulation has been chosen, can be seen as directed more to the wisdom of the legislation . . . [and are] inappropriate for our judicial function."). Instead, for such errors the legislature is answerable directly to the people at the polls through the democratic process. Am. Sash & Door Co., 335

29

U.S. at 556 ("[A] democracy need not rely on the courts to save it from its own unwisdom.") (Frankfurter, J., concurring). As Justice Thurgood Marshall often cautioned his colleagues on the court, "[t]he Constitution does not prohibit legislatures from enacting stupid laws." N. Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 209 (2008) (Stevens, J., concurring).

**F. McCall Does Not Overrule this Well-Established Law and Abandon the Traditional Rational Basis Test.**

The Street Vendors argue that McCall overruled this well-established law. In McCall, the Florida Supreme Court declared that the cap on non-economic damages in medical malpractice claims contained in section 766.118, Florida Statutes (2005), violated the rational basis test of the equal protection provision of Florida's constitution as applied to a wrongful death case. This holding reflects the judgment of five of the seven justices. It is the law of Florida. The five justices, however, did not agree on a rationale for this holding. Instead, two of the five joined one opinion and three a different opinion. We reject the Street Vendors' contention that the two plurality opinions should be read together as heralding a revolution in the law of Florida substantive due process.

Admittedly, Justice Lewis' plurality opinion gives the appearance of a willingness to depart from the traditional rational basis test. This impression stems from the manner that the opinion sets aside the Legislature's judgment "that Florida was in the midst of a bona fide medical malpractice crisis." McCall, 134

30

So. 3d at 909 (plurality opinion). The opinion forthrightly admits that "in 2012 one medical malpractice insurance company . . . charged obstetricians in Miami–Dade County more than $190,000 for $1 million of coverage . . . [and] charged orthopedists in Miami–Dade County more than $115,000 for $1 million of coverage." Id. at 914 n.10 (plurality opinion). These facts alone appear to make the existence of a malpractice crisis at least fairly debatable. Nevertheless, after undertaking its own reevaluation of data culled from both inside and outside the legislative record, the opinion rejects the Legislature's judgment "that Florida was in the midst of a bona fide medical malpractice crisis" because it is "not fully supported by available data," "is most questionable," and "is dubious and questionable at the very best." Id. at 906-07, 909 (plurality opinion).

This plurality opinion delves into the legislative debate and reweighs the Legislature's findings. Its reasoning is reminiscent of the manner in which the Lochner era decision in Atkins set aside legislature findings because they were only "mildly persuasive." 261 U.S. at 560. For authority to set aside legislative fact findings, the plurality opinion actually cites the 1924 Lochner era case of Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924). McCall, 134 So. 3d at 913 (plurality opinion).

We do not need, however, to determine whether Justice Lewis' plurality opinion intended to modify the traditional rational basis test because only one other

31

justice joined the opinion. Justice Pariente's separate plurality opinion, which was joined by two other justices, is labeled "concurring in result," signaling its intent not to adopt Justice Lewis' reasoning. If there is any doubt on this point, Justice Pariente's plurality opinion expressly declines to join Justice Lewis' rationale because "there is simply no precedent for this Court to engage in its own independent evaluation and reweighing of the facts and legislative policy findings, as done by the plurality, when conducting a rational basis analysis." Id. at 921 (Pariente, J., concurring in result).

At the same time, Justice Lewis' opinion declined to adopt the reasoning in Justice Pariente's opinion based on their view that the "concurring in result opinion argues that only a single decision [St. Mary's Hosp., Inc. v. Phillipe, 769 So. 2d 961, 971 (Fla. 2000)] which does not set forth a proper analysis be applied." Id. at 905 (plurality opinion). Thus, neither of the plurality opinions garnered a majority of the Court.

Admittedly, McCall's holding conflicts with the decision of the Eleventh Circuit Court of Appeals involving the same parties which held that the limitation on non-economic damages at issue did not violate the federal rational basis test.[8]

---

[8] Estate of McCall v. United States, 642 F.3d 944, 951 (11th Cir. 2011) ("The Florida legislature could reasonably have concluded that such a cap would reduce damage awards and in turn make medical malpractice insurance more affordable and healthcare more available. We therefore conclude that Florida's statutory cap on noneconomic damages for medical malpractice claims does not violate the Equal Protection Clause of the United States Constitution.").

This federal decision was relied upon by the dissent.[9] But neither of the two plurality opinions in McCall discusses the discrepancy between the holding of the Florida Supreme Court and the Eleventh Circuit. In light of this silence, we attribute the different result to the reality that judges can disagree over the application of a legal test—not to the idea that Florida has adopted a more subjective test. And, of course, regarding the interpretation of the Florida Constitution, the Florida Supreme Court's word is final.

Most importantly, neither of the plurality opinions in McCall expressly indicates an intent to overrule cases like Haire, Lite, Lasky, Belk-James, McKnight, Shands, Gallagher, or Warren. We cannot assume the Court intended to silently overturn such well-established, long standing, black letter law. Puryear v. State, 810 So. 2d 901, 905 (Fla. 2002). We are particularly wary of jumping to such a conclusion when to do so would undermine the rational basis test, a centerpiece of modern separation of powers, which was developed to resolve a constitutional crisis that resulted from a subjective substantive due process test.

Thus, unless and until the Court signals in a more overt manner an intent to overrule the great body of law established by these precedents, we are bound to apply the Court's holdings in Haire, Lite, Lasky, Belk-James, McKnight, Shands, Gallagher, and Warren, which treat the Florida rational basis test as the same as the

---

[9] McCall, 134 So. 3d 894 (Polston, J., dissenting).

federal rational basis test, and use the five principles discussed above that the Court has adopted to guide its application.

**G. The Challenged Ordinance Provisions Pass Florida's Rational Basis Test.**

Applying the traditional rational basis test to the two challenged Ordinance provisions, we conclude that they are constitutional. The burden of proof was on the Street Vendors as the ones attacking the laws. Haire, 870 So. 2d at 782. They had to prove that "there is no conceivable factual predicate which would rationally support the [law]." Fla. High Sch. Activities Ass'n, 434 So. 2d at 308. They have failed to meet that burden because it is at least debatable that the challenged Ordinance provisions bear a rational relationship to a legitimate government interest. Gallagher, 605 So. 2d at 70.

Protecting pedestrians, vendors, and vehicles in the streets from accidents is obviously a legitimate government purpose. Reasonable people might believe that limiting the vendors to selling in the lanes of traffic only the inventory that they can carry will lessen the accidents that might otherwise arise from vendors taking orders from cars stopped in the lanes of traffic at red lights, crossing traffic to the sides of the streets to obtain product from inventories displayed there, and then re-crossing traffic to deliver the order before the light turns green.

34

Enforcing the provisions of the City's zoning code is also a legitimate government purpose. Reasonable people might believe that restricting vendors to displaying and storing inventory on public or private property in the same way the owners of such property would be restricted serves that purpose. They might also believe that prohibiting vendors from permanently stopping or remaining on public or private property, "unless allowed for by zoning," would serve a similar purpose.

Because we are applying Florida's traditional rational basis test, we decline the Street Vendors' argument that they are entitled to a trial on whether or not any of these considerations can be established or disproven by evidence admitted in a court of law. "[U]nder a rational basis test, a legislative choice is not subject to courtroom fact-finding." Haire, 870 So. 2d at 787 (citation and quotation omitted). "A rational relationship exists where, as here, it is found that the legislature rationally could have believed that the challenged statutory scheme would promote the asserted legislative objective. Whether the statutory scheme in fact would promote the legislative objective is not dispositive." Gallagher, 605 So. at 70 (emphasis added).

Finally, we reject the Street Vendors' argument that the Ordinance is unconstitutional because other wiser, fairer, or better ways exist to accomplish the City Commission's goals. "[A]rguments . . . which essentially question whether the best means of regulation has been chosen, can be seen as directed more to the

35

wisdom of the legislation . . . [and are] inappropriate for our judicial function." Belk-James, 358 So. 2d at 177. Where, as here, no suspect class or fundamental right is implicated, "[t]he wisdom, policy, or motives which prompt a legislative enactment, so far as they do not contravene some portion of the express or implied limitation upon legislative power found in the Constitution, are not subject to judicial control." Scott, 107 So. 3d at 385 (citation omitted).

## CONCLUSION

McCall did not grant Florida courts a license to overturn economic laws based upon a judicial reweighing and reevaluating of legislative findings. We affirm the trial court's judgment which stated "[i]n accordance with the rational basis standard . . . the Court finds that there are legitimate interests supporting the challenged Ordinance provisions and that the challenged Ordinance provisions are rationally related to such legitimate government interests."

Affirmed.